**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ARJO INC. AND HUNTLEIGH TECHNOLOGY LIMITED, | § § § | |
| *Plaintiffs*, | § § | Civil Action No. 5:21-cv-1173 |
| v. | § § | |
| TURN MEDICAL, LLC, ERIC BARTA, CHRIS NIEDERKROM, TARA PSENCIK, AND KEVIN WILSON, | § § § § | |
| *Defendants*. | § | |

**COMPLAINT**

TO THE HONORABLE COURT:

For their complaint against Defendants Turn Medical, LLC, Eric Barta, Chris Niederkrom, Tara Psencik, and Kevin Wilson, Plaintiffs Arjo Inc. and Huntleigh Technology Limited state as follows:

**NATURE OF THE ACTION**

1.      This action arises from Defendants' infringement of Plaintiffs' patents, theft of confidential and trade secret information and concept models from Plaintiffs, and breaches of contracts stemming from the theft and unauthorized use of Plaintiffs' valuable know-how and confidential, trade secret information to directly compete with Plaintiffs in violation of the patent laws of the United States, Title 35 of the United States Code, the Defend Trade Secrets Act, the Texas Uniform Trade Secrets Act, and Texas common law requiring that Defendants' unlawful and unauthorized actions be enjoined by this Court.

2.      Plaintiff Arjo Inc. ("Arjo") is a leader in the medical device industry and offers a wide range of medical beds that provide infection control, enhanced ergonomics, comfort, safety,

and ease of use, which promote effective risk management.  Arjo's healthcare offerings include medical beds used within the acute and long-term care setting as well as related accessories that are designed to support and assist the resident/patient and the caregiver.  Arjo's products help to reduce fall risk, improve pressure area care, and promote resident/patient independence and comfort.

3.      Plaintiff Huntleigh Technology Limited ("HTL") is part of the Arjo family of companies and is the past and current assignee of a number of patents stemming from inventions by Arjo employees.

4.      Defendant Turn Medical, LLC ("Turn Medical") was founded by former Arjo employees shortly after they ceased working for Arjo.  Before leaving Arjo, these employees were responsible for a confidential and trade-secret improvement project concerning Arjo's patented ROTOPRONE® bed.   These employees secreted away Arjo's confidential and trade secret information and solicited Arjo personnel to unfairly compete with Arjo.

5.      Defendants Eric Barta, Chris Niederkrom, Tara Psencik, and Kevin Wilson are all ex-Arjo employees who were responsible for research and development of Arjo's products and are currently members of Turn Medical's leadership team.

**THE PARTIES**

6.      Plaintiff Arjo Inc. ("Arjo") is a Delaware corporation with its principal place of business in Addison, Illinois and an office in San Antonio, Texas.

7.      Plaintiff Huntleigh Technology Limited ("HTL") is a United Kingdom company incorporated on March 4, 1985 with the registered office located in Dunstable, Bedfordshire, United Kingdom.  HTL is a member of the Arjo Group, and a sister company to Arjo Inc.

8.     Upon information and belief, Defendant Turn Medical, LLC, is a Texas limited liability company having a principal office at 1160 Arion Pkwy Ste 102, San Antonio, TX 78216-2871 USA.  Turn Medical, LLC was formed on or about November 9, 2018. Defendants Eric Barta, Chris Niederkrom, and Kevin Wilson are the member/managers of Defendant Turn Medical, LLC and each is a citizen of the State of Texas. Defendant Eric Barta is the registered agent for Turn Medical for service of process.

9.     Upon information and belief, Eric Barta is a co-founder of Turn Medical and resides at 215 Glentower Drive, San Antonio, Texas, 78213-1914.  Barta is listed as a Manager of Turn Medical as of April 2021 and is the Chief Program Officer of Turn Medical.

10.     Upon information and belief, Chris Niederkrom is a co-founder of Turn Medical and resides at 12906 N Hunters Circle, San Antonio, Texas, 78230-2865.  Niederkrom is listed as a Manager of Turn Medical as of April 2021 and is the Chief Operations Officer of Turn Medical.

11.     Upon information and belief, Tara Psencik is a co-founder of Turn Medical and resides at 735 Eagle Landing Drive, Belton, Texas, 76513-5704.  As of September 2020, Tara Psencik is the Chief Executive Officer and Chief Clinical Officer of Turn Medical.

12.     Upon information and belief, Kevin Wilson is a co-founder of Turn Medical and resides at 22022 Big Bend Canyon, San Antonio, Texas, 78258-4958.  Wilson is listed as a Manager of Turn Medical as of April 2021 and is the Chief Technology Officer of Turn Medical.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a), and supplemental jurisdiction over the state common law claims under 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants reside in this State and District and regularly transact business in this State and District and engage in other systematic and continuous contacts in this State and District, a substantial part of the events or omissions forming these claims occurred in this District, and certain agreements signed by Defendants are governed by the laws of this State.

15. Venue is proper in this District and Division pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).  Venue is also proper in this District pursuant to 28 U.S.C. § 1400(b) because, upon information and belief, this is a judicial district where Defendant Turn Medical has committed acts of patent infringement as alleged in this Complaint, and this is a judicial district where Defendant Turn Medical has a regular and established place of business.  Further, Defendant Turn Medical is incorporated in this state with its principal place of business in this District.

## THE ARJO THERAPEUTIC BED BUSINESS

16. Arjo, founded in 1978, is a global leader in medical devices, services, and solutions that improve quality of life for people with reduced mobility and age-related health challenges.  In 1995, Arjo was acquired by the Getinge Group ("Getinge"), which then expanded Arjo's product offering to include medical beds, patient lifts, and bathing systems.  Arjo became the foundation of Getinge's Extended Care business.

17. In 2007, Getinge acquired Huntleigh Technology PLC ("Huntleigh") to establish the ArjoHuntleigh brand.  Huntleigh was founded in 1983 and listed on the London Stock Exchange.  Huntleigh's groundbreaking product, the Nimbus Dynamic Flotation System mattress, remains a part of Arjo's product offerings to this day.  The Huntleigh brand became known as a trusted manufacturer of specialized mattresses for the treatment of pressure injuries, beds for intensive care, specialist care and nursing homes, products for the prevention of venous

4

thromboembolisms, and equipment for fetal and vascular diagnostics, and was a market leader in several of its product categories.  At the time of the acquisition by Getinge, Huntleigh had over 2,600 employees and a sales reach of 120 countries.  The merger of Arjo and Huntleigh made Getinge a global leading player in the areas of patient handling, wound care, and patient hygiene.

18.     Kinetic Concepts, Inc. (KCI) was founded in 1976 in San Antonio, Texas, to help prevent the pulmonary complications associated with immobility.  Over time, the company developed a line of therapeutic specialty beds as part of its Therapeutic Support Systems$^{TM}$ (TSS) business, including a specialty bed for acute care patients with pulmonary complications called ROTOPRONE®.  In 2012, KCI announced that it signed a definitive agreement to sell its TSS business to Getinge AB for a total enterprise value of $275 million.  Under the terms of the agreement, Getinge purchased assets of the TSS business, including its comprehensive portfolio of patented specialty therapeutic beds, mattress replacement systems, and other support surfaces and patient mobility devices for the therapeutic wound care, bariatric and critical care settings, including the patented ROTOPRONE® therapeutic bed and SKIN IQ® Microclimate Manager. Getinge also offered employment to TSS employees.  To ensure that TSS customers continued to receive best-in-class service and commitment, KCI agreed to provide transition services to Getinge after the close of the transaction.  The acquisition of TSS provided an optimal expansion of Getinge's Extended Care business, boosting the competencies of the ArjoHuntleigh operations, and offered substantial value, innovation, and choice to customers around the world.

19.     In 2017, the Getinge Board of Directors spun-off Arjo to Getinge's shareholders and Arjo Inc. became a stand-alone company.

### ARJO'S PATENTED SKIN IQ® MICROCLIMATE MANAGER

20.     Arjo's SKIN IQ® Microclimate Manager is a fluid resistant, vapor permeable, single patient or multiple use mattress cover designed to manage microclimate thanks to its unique Negative Airflow Technology (NAT).  NAT helps to reduce or maintain skin temperature while preventing excess moisture or humidity build up on the skin's surface.  The technology uses a fan to move moisture vapor that passes through the top layer into the middle layers' open construction spacer material.  The NAT also means that moisture and air are moved away from areas where the skin is directly in contact with the support surface.

21.     The SKIN IQ® product entered the market in 2010.  Each SKIN IQ® mattress cover is marked at the foot with the SKIN IQ® logo and a diagram of two feet indicating the placement of the cover:



*Figure 1:  SKIN IQ® mattress cover marked with logo and "feet" diagram.*

22.     SKIN IQ® is protected by a number of patents including, but not limited to, U.S. Patent Nos. 7,914,611 and 10,568,435.

23.     On March 29, 2011, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 7,914,611 (the "'611 Patent"), titled "Multi-Layered Support System."  The face of the '611 patent lists John H. Vrzalik, Alan L. Bartlett, and Royce Johnson as inventors, and identifies KCI Licensing, Inc. as the assignee.  Plaintiff HTL is the current assignee of the '611 Patent.  A true and correct copy of the '611 patent is attached hereto as Exhibit 1.

24.     On February 25, 2020, USPTO issued U.S. Patent No. 10,568,435 (the "'435 Patent"), titled "Multi-Layered Patient Support Cover System."  The face of the '435 patent lists James A. Luckemeyer and Christopher Locke as inventors, and identifies Plaintiff HTL as the assignee.  Plaintiff HTL is the current assignee of the '435 Patent.  A true and correct copy of the '435 patent is attached hereto as Exhibit 2.

## ARJO'S ROTOPRONE® THERAPY SYSTEM BED

25.     One of Arjo's premier products is the ROTOPRONE® Therapy System.  Arjo rents this product to healthcare providers in the United States.  Prior to Turn Medical's advent into the market, the ROTOPRONE® was the only product of its kind which automates the patient in the prone—or face down—position in order to, among other things, help remove mucous and other secretions that settle in the lungs.  By removing these fluids, it improves breathing and the delivery of oxygen to the bloodstream.  Traditionally, this process was performed manually.

26.     Arjo's critical care products, such as its industry standard ROTOPRONE® bed, were designed with caregivers and patients in mind, providing the ability to mobilize and implement kinetic therapy and prone therapy effectively and efficiently.  The benefits of using the ROTOPRONE® and Arjo's Critical Care surfaces include reducing the risk of patient and caregiver injuries, increasing staff efficiency, and reducing the risks and complications of patient immobility.

27.     Arjo's predecessor, KCI, developed the ROTOPRONE® Therapy System to help simplify and automate the process of moving patients into the prone position.

28.     Beginning in 2001, KCI sought and was granted a number of patents to cover various aspects of the ROTOPRONE® bed.  For example, U.S. Patent Nos. 6,671,905 and 7,017,211 claim therapeutic prone positioning beds comprising a base frame, a patient support platform rotatably mounted on the base frame for rotational movement about a longitudinal rotational axis of the patient support platform, and a drive system for rotating the patient support platform on the base frame, along with various subcomponents, for example head support apparatus.  U.S. Patent No. 6,934,986 is directed to a mechanism to provide a direct, wired connection to the patient support platform, and U.S. Patent No. 7,219,379 is directed to a mechanism to provide a direct, wired connection to the patient support platform.  Defendant Chris Niederkrom was a named inventor on these and other patents owned by Plaintiffs or their predecessor companies that claim features of the ROTOPRONE® bed.

## ARJO'S CONFIDENTIAL PROJECT TO IMPROVE THE ROTOPRONE® THERAPY SYSTEM BED

29.     In 2004, Arjo (then KCI) began to market the ROTOPRONE® bed.  Defendant Chris Niederkrom was KCI's ROTOPRONE® Project Manager at the time.

30.     ROTOPRONE® was recognized at the time as a new and promising tool in treatment of severe respiratory failure, and it allowed patients who require kinetic therapy in the extent of prone positioning who could so far not be turned to be treated.  Since 2004, ROTOPRONE® has been the gold-standard for automated proning beds.

31.     Arjo continually engages in research and development to enhance and improve its products, including ROTOPRONE®.  In 2017, Arjo instigated a new project to investigate ways to improve the ROTOPRONE® bed to better serve the medical community.  This endeavor

8

included "Project Revolve," which focused on improvements to ROTOPRONE® bed, and "Project Tetris," which focused on the user interface board for the bed. Arjo sought to introduce the next-generation automated proning ROTOPRONE® bed in the United States and expand the automated proning market with new business models. Arjo employees knew that these projects were highly proprietary and confidential.

32.     Defendants Christopher Niederkrom, Eric Barta, Tara Psencik, and Kevin Wilson were all members of the Revolve and Tetris committees while employed by Arjo. Each was a team lead for Project Revolve and spent hundreds of hours each on Project Revolve.

33.     Both Project Revolve and Project Tetris involved extensive focus groups and interviews with medical professionals and Arjo customers to gather valuable insights, explore beliefs, and provide direction to help define specific feature requirements for an improved automated proning system. Participants in these meetings and focus groups were required to sign non-disclosure agreements to confirm that the attendees would keep details of any information shared strictly confidential. The meetings were recorded for the sole purpose of writing a report of the meeting output and were not shared outside of the internal research and development team. Arjo's strict confidentiality policies regarding Project Revolve and Project Tetris were well known to every employee working on these projects and were clearly stated on internal documents discussing the projects, these meetings, and focus groups.

34.     Project Revolve and Project Tetris ultimately developed a highly confidential and valuable list of unique user needs that Arjo's internal research and design team used to create new and innovative design elements. A concept model of these changes and improvements to the ROTOPRONE® bed was created and kept at Arjo's San Antonio facility. Arjo employees agreed and knew that the prototype concept model was to be kept highly confidential.

35.     Defendants Christopher Niederkrom, Eric Barta, and Tara Psencik participated as representatives from Arjo at the Automated Prone Positioning (Project "Revolve") Clinical Advisory Board event on Monday May 22, 2017 from 5:45pm–7:45pm at the Marriott Marquis Hotel, 1777 Walker Street, Houston, TX 77010.  (*See* Exhibit 3, AUTOMATED PRONE POSITIONING (PROJECT "REVOLVE") CLINICAL ADVISORY BOARD SUMMARY OF FINDINGS, Prepared by Paula Cooper, Principal of The Medical Marketing Boutique 2 June 2017 ("May 2017 Advisory Board") at 1).[1]  The purpose of this research was to explore ideas and provide direction to help define specific feature requirements for Project Revolve (a new automated proning bed to replace the ROTOPRONE®).  (*Id.*).  The session was moderated by an independent market researcher and observed by various members of the Arjo product development team.  (*Id.*).  Attendees were recruited by Arjo based upon their past usage of ROTOPRONE®; they were required to sign a non-disclosure agreement and were paid for their participation.  (*Id.*).

36.     Participants at the May 2017 Advisory Board recommended, among other



*Figure 2:  Project Revolve improved ROTOPRONE® prototype with SKIN IQ® surface, as shown by the SKIN IQ® logo and a diagram of two feet indicating the placement of the cover.*

---

[1] Exhibit 3 contains confidential and proprietary information. Contemporaneous with the filing of this Original Complaint, Plaintiffs are filing a sealed motion to file Exhibit 3 under seal.

improvements, that the bed surface should be a moisture-wicking material, breathable, or something that circulates air to help keep patients cool and dry.  At the time, many practitioners utilized Arjo's RIK® Fluid Overlay product in conjunction with ROTOPRONE®.  Arjo's RIK® Fluid Overlay (commonly referred to as a RIK® Pad) "utilizes MicroFlow™ technology, a viscous fluid which is designed to conform to the user's body and help to minimize interface pressures. The RIK® Fluid Overlay surface reduces the contact pressure at the skin-overlay interface by increasing the surface area over which the individual is supported." (https://www.arjo.com/int/products/pressure-injury-prevention---pip/foam/rik-fluid-overlay/) (last visited November 22, 2021).  Arjo's patented SKIN IQ® Microclimate Manager was considered as a potential surface candidate, and was incorporated into the Revolve Prototype Bed.

37.     Defendant Tara Psencik, then an Arjo clinical educator, demonstrated the ROTOPRONE® face cradle to stimulate the conversation.  (*Id*. at 5).  Ms. Psencik is now CEO of Defendant Turn Medical.  Two improved face cradle designs were suggested.  (*Id*.).  Participants recommended that fully supporting the head while being able to visualize the mouth, eyes, and ears in prone position was important.  (*See* Exhibit 3 at 4).  The ability to visualize the nose was requested, as was access to the entire face when the patient is in supine position with emphasis on the oral cavity for hygiene and endotracheal tube (ETT) management.  (*See id*.).  Alternative ways to access and cradle the face in prone position were brainstormed.  (*See id*. at 5).  The participants also described issues with sweat and secretions with patients' faces.  (*Id*. at 4).  Like the bed surface, participants were looking for moisture-wicking material and increased access to the whole face that could also alleviate pressure on some of the other points.  (*Id*. at 6).

38.     During the meeting, Vincent Lam of Arjo created a confidential sketch of new head support based on these insights.  (*Id*. at 14).  The sketch demonstrates the practitioners' concerns

about keeping certain parts of the patients' faces cool and dry to avoid breakdown, and the areas of the face including the ears that should remain visible and accessible to care givers.

39.     The Revolve Project issued a Gate Review slide deck on April 19, 2017 outlining the key insights gained by the proprietary and confidential research the team had performed along with features and goals of a proposed improved product.   (Exhibit 4, Revolve Gate Review 0 Slides).[2]

40.     The Project Revolve Research and Development team incorporated many of the proprietary findings from the various confidential focus groups and advisory boards into a new prototype bed.

41.     The Revolve Prototype was developed and housed in the Validation and Verification laboratory ("V&V Lab") at Arjo's secure and locked facility in San Antonio, Texas, which required key cards to enter.  Arjo employees had 24-hour access to the San Antonio facility via their key cards.  Access to the V & V Lab was restricted to only certain Arjo employees, mainly those employees on the Project Revolve Research and Development team, and was itself locked at all times, requiring key cards to access.  The Revolve Prototype was kept in V & V Lab and was always returned there at night if it was moved during the day.  Access to the V &V Lab and the Revolve Prototype was so restricted that many of the Arjo employees at the San Antonio facility were not aware that the Revolve Prototype was even under development.

---

[2] Exhibit 4 contains confidential and proprietary information. Contemporaneous with the filing of this Original Complaint, Plaintiffs are filing a sealed motion to file Exhibit 4 under seal.



*Figure 3: Defendant Tara Psencik (and others) shown in Arjo's secure Validation and Verification laboratory with the Project Revolve improved ROTOPRONE® prototype.*

42.     Many contemplated improvements developed by the team have not yet been introduced by Arjo to the market.  These concepts were, are, and remain proprietary, confidential, and Arjo trade secrets.

43.     Over the years, Arjo has spent considerable time and expense to protect the technology surrounding its ROTOPRONE® bed and SKIN IQ® Microclimate Manager, including proposed changes and improvements.  Arjo's current and future business success is critically dependent on its ability to decide when to implement (or not to implement) these trade secret changes to its products and whether and when they will enter the market.

44.     Arjo's product development plans are also of great monetary value to Arjo.  Arjo employees and specialized consultants sign confidentiality agreements and agree to keep the Arjo

13

information confidential and treat it as a trade secret.  They also agree to certain non-solicitation and non-competition provisions that are reasonable and necessary to protect the good will, trade secrets, business interests, and confidential and proprietary interests of Arjo.

45.     Defendants, also in the medical bed industry, are well aware of the highly confidential and trade secret nature of the Arjo product development plans and that ex-Arjo employees have access to proprietary diagrams, design documents, architecture diagrams, source code, functional specifications, processes, and other restricted confidential information and trade secrets subject to a strict confidentiality agreement.

## ARJO'S CONFIDENTIALITY POLICIES

46.     Arjo's employees are retained to provide design, implementation, training, and support for Arjo's products.  As a condition of employment, they agree to keep Arjo's highly confidential and proprietary information confidential which is memorialized by signing confidentiality agreements.

47.     Under these agreements, Arjo employees agree, among other things, to hold in strictest confidence, and not to use any Arjo confidential information.  This "Confidential Information" includes but is not limited to any of Arjo's proprietary information, technical data, trade secrets or know-how, including, without limitation, research, product plans, products, services, suppliers, customer lists and past, current, and future customers.

48.     Arjo's employees also agree to not solicit any of Arjo's current personnel after separation from Arjo.  Arjo's consultants also agree not to perform any services directly or indirectly for any Arjo customers that were introduced to the consultant by Arjo after separation from Arjo.  And, Arjo consultants also agree to not offer consulting services in Arjo's proprietary

solutions for any customers, partners, or competitors of Arjo after separation without Arjo's written consent.

49.     Upon information and belief, Defendants are and were aware of these obligations agreed to in writing by Arjo's consultants.

## DEFENDANTS' AGREEMENTS WITH ARJO

### *Eric Barta*

50.     Mr. Barta was hired by Arjo's predecessor, KCI, in 2003 where he was employed until September of 2018.  Mr. Barta remained employed by KCI, ArjoHuntleigh, and Arjo Inc., respectively, until about September of 2018.

51.     On October 4, 2018, Mr. Barta signed a Separation Agreement and General Release with Plaintiffs. (Exhibit 5).  As part of that agreement, Mr. Barta agreed, among other things, to:

> return all documents, materials, equipment, keys, recordings, client contact information, other client-related information, sales information, workforce information, production information, computer data, and other material and information relating to Arjo, or the business of Arjo, and not to retain or provide to anyone else any copies, excerpts, transcripts, descriptions, portions, abstracts, or other representations thereof. (*Id*. at ¶7).

Mr. Barta received $148,610.65 as consideration for, among other things, the general release and the other promises in the Separation Agreement.  (*Id*. at ¶ 2(a)).

52.     Upon information and belief, Barta signed other agreements with KCI which were assigned to Arjo, including confidentiality and non-disclosure agreements.

53.     Upon information and belief, Mr. Barta began working as Turn Medical's Chief Program Officer shortly after leaving employment at Arjo.

*Christopher Niederkrom*

54.     Mr. Niederkrom was hired by KCI in about June of 2002.  Mr. Niederkrom remained employed by KCI, ArjoHuntleigh, and Arjo Inc., respectively, until about September of 2018.

55.     On October 4, 2018, Mr. Niederkrom signed a Separation Agreement and General Release with Plaintiffs.  (Exhibit 6).  As part of that agreement, Mr. Niederkrom agreed to:

> return all documents, materials, equipment, keys, recordings, client contact information, other client-related information, sales information, workforce information, production information, computer data, and other material and information relating to Arjo, or the business of Arjo, and not to retain or provide to anyone else any copies, excerpts, transcripts, descriptions, portions, abstracts, or other representations thereof.  (*Id*. at ¶ 7).

56.     Mr. Niederkrom received $175,958.16 as consideration for, among other things, the general release and the other promises in the Separation Agreement.  (*Id*. at ¶ 2(a)).

57.     Upon information and belief, Niederkrom signed other agreements with KCI which were assigned to Arjo, including confidentiality and non-disclosure agreements.

58.     Upon information and belief, Mr. Niederkrom started at Turn Medical as Chief Operations Officer shortly after leaving employment at Arjo.

*Tara Psencik*

59.     Ms. Psencik was hired by KCI in about May of 2005.  Ms. Psencik remained employed by KCI, ArjoHuntleigh, and Arjo Inc., respectively, until about July of 2019.

60.     On July 14, 2017, Ms. Psencik signed an At-Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement with Arjo's predecessor, ArjoHuntleigh, Inc./Getinge Group. (Exhibit 7).  As part of that agreement, Ms. Psencik agreed that she would not, at any time during her employment, or after the conclusion of her employment:

communicate, disclose, or otherwise make available to any person or entity (other than the Company, but only when such disclosure is necessary and appropriate to perform my responsibilities), or use for my account (except in the course of my employment with the Company, but only when such disclosure is necessary and appropriate to perform my responsibilities), or for the benefit of any other person or entity, any trade secrets or information or materials proprietary or confidential to the Company that relates to the Company's business or affairs which is of a confidential nature ("Confidential Information").

(*Id*. at ¶3 (a)).

61.     Ms. Psencik's Agreement further defines Confidential Information to mean information or material that is commercially valuable to the Company and not generally known in the industry.  (*Id*.).

62.     Ms. Psencik further agreed that she would retain such knowledge and information which she acquired and developed during her employment respecting such Confidential Information in trust for the sole and exclusive benefit of Arjo and its successors and assigns.  (*Id*.).

63.     Ms. Psencik further agreed to following "no moonlighting" provision:

During my employment with the Company, I agree to devote my full time and best efforts to my employment with the Company.  Therefore, I shall not accept or continue in any job, consulting work, or other employment other than with the Company without the prior written approval of the Company's President.

(*Id*. at ¶2).

64.     Ms. Psencik further agreed to following "Non-Solicitation" of Customers provision:

During the term of my employment, and for a period of one (1) year following the conclusion of my employment with the Company, I shall not, whether directly or indirectly, individually, or as an employee or agent, or on behalf of another, sell, solicit the sale of, support the sale of, induce the sale of, or supervise the sale of any Competitive Product with respect to any Getinge Customer, nor make any other efforts to divert or take away any Getinge Customer.

(*Id*. at ¶4).

65.     Ms. Psencik further agreed to following "Non-Solicitation" of Employees provision:

> I shall not, during my employment, and for a period of one (1) year following the conclusion of my employment with the Company, whether directly or indirectly, individually, or as an employee or agent, or on behalf of another, solicit, induce or attempt to induce any Company employee or contractor to leave his or her employment or terminate its contractual relationship with the Company.

(*Id*. at ¶5).

66.     The At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017, are governed by the laws of the State of New Jersey.  (*Id*. at ¶ 12).

67.     While employed by Arjo, Ms. Psencik was the Clinical Manager of ROTOPRONE®, which included customer education, implementations, and training.  She was responsible for meeting with Arjo clients to ensure proper implementation and training.  As such, she was intimately familiar with Arjo's customers and their respective decision makers regarding therapeutic beds.

68.     Upon information and belief, Ms. Psencik started at Turn Medical as the Chief Executive Officer and Chief Clinical Officer in about September of 2020.

***Kevin Wilson***

69.     Mr. Wilson was hired by KCI in about October of 2011.  Mr. Wilson remained employed by KCI, ArjoHuntleigh, and Arjo Inc., respectively, until about September of 2018.

70.     On October 1, 2018, Mr. Wilson signed a Separation Agreement And General Release with Plaintiffs.  (Exhibit 8).  As part of that agreement, Mr. Wilson agreed to:

> return all documents, materials, equipment, keys, recordings, client contact information, other client-related information, sales information, workforce information, production information, computer data, and other material and information relating to Arjo, or the business of Arjo, and not to retain or provide to

anyone else any copies, excerpts, transcripts, descriptions, portions, abstracts, or other representations thereof.  (*Id.* at ¶ 7).

71.     Mr. Wilson received $77,231.70 as consideration for, among other things, the general release and the other promises in the Separation Agreement.  (*Id.* at ¶ 2(a)).

72.     Upon information and belief, Wilson signed other agreements with KCI which were assigned to Arjo, including confidentiality and non-disclosure agreements.

73.     Upon information and belief, Mr. Wilson started at Turn Medical as Chief Operations Officer shortly after leaving employment at Arjo.

## DEFENDANTS' THEFT OF ARJO'S PROPRIETARY AND TRADE SECRET INFORMATION

74.     Defendant Turn Medical was founded by ex-Arjo employees.

75.     Shortly after leaving Turn Medical, Defendants Barta, Niederkrom, and Wilson formed Turn Medical.  (*See* https://www.startupssanantonio.com/turn-medical-automates-patient-prone-positioning-for-critical-care/ (last visited November 22, 2021) ("Turn Medical's chief program officer Eric Barta, chief technology officer Kevin Wilson, and Chris Niederkrom, chief operations officer, worked together previously at Arjo, a Swedish medical device company, and at the medical technology-focused Kinetic Concepts Incorporated (KCI) headquartered in San Antonio.  The trio launched Turn Medical in October 2018.").  Defendant Psencik is a co-founder of Turn Medical.  (*See id.*).

76.     The Turn Medical limited liability company was formed in Texas on November 9, 2018 naming Defendants Barta, Niederkrom, and Wilson as the initial managers.

77.     The domain <www.turnmedical.com> was registered in November of 2018.

78.     On information and belief, Defendants Barta, Niederkrom, Psencik, and Wilson used and continue to use their intimate knowledge of Arjo, its customers, and its employees to specifically target certain Arjo employees to recruit for their specialized skills and knowledge.

79.     The entire Turn Medical leadership team—Eric Barta, Andrea Coxon, Arnie Garcia, Judy Long, Jeannette Losole, Chris Niederkrom, Tara Psencik, and Kevin Wilson— consists of former Arjo employees, including Defendants Barta, Niederkrom, Psencik, and Wilson. (*See* https://turnmedical.com/leadership/) (last visited November 22, 2021).

80.     Defendants continue to solicit Arjo employees with proprietary trade secret information about Arjo's business, products, and customers.

81.     Defendant Turn Medical has one single product: the Pronova-$O_2$™ Automated Prone Therapy System ("Pronova").   The Pronova product is a direct competitor to Arjo's ROTOPRONE® bed.

82.     Turn Medical's Pronova product incorporates its InteliDerm surface, which is an infringing copy of Arjo's patented SKIN IQ® Microclimate Manager.

83.     Upon information and belief, Turn Medical has begun marketing and promoting the Pronova product to Arjo's customers to directly compete with Arjo's ROTOPRONE® product.

84.     The Pronova product contains many design elements that were developed at Arjo as a result of the confidential Revolve and Tetris Projects.

85.     For example, Turn Medical has copied the head rest design that was sketched during the confidential the discussions at the May 2017 Advisory Board.   (*See* Exhibit 9, Confidential Analysis of Turn Medical's Product).[3]

---

[3] Exhibit 9 contains confidential and proprietary information. Contemporaneous with the filing of this Original Complaint, Plaintiffs are filing a sealed motion to file Exhibit 9 under seal.

86.     Turn Medical has also copied a number of other specific improvements identified in the Confidential Revolve Gate Review 0 summary document.  (*See id*.).

87.     Turn Medical has also copied the SKIN IQ® Microclimate Manager system with its InteliDerm product.  According to Turn Medical's website, the InteliDerm product has 1) a first layer comprising a vapor permeable material (the Patient Interface in the figure below), 2) a second layer comprising a spacer material (the Air Flow Spacer layer in the figure), and 3) a third layer (the Impermeable membrane and pressure redistribution surface below) where the second layer is between the first layer and the third layer.  (*See* https://turnmedical.com/inteliderm-powered-skin-protection/) (last visited November 22, 2021).



The website explains that "Active moisture vapor removal manages moisture at the surface of the skin," which means that the "patient interface" layer must be vapor permeable in order for the "moisture vapor' to be "removed."  (*Id*.).  The same website explains that InteliDerm is "a system that moves air and moisture to decrease the risk for damage to a patient's skin.  (*Id*.).  It also says that "InteliDerm active airflow technology provides a cooling effect at the surface of the skin.

21

(*Id*.).  The Pronova O$_2$ User Manual explains that "InteliDerm Pumps" move air in the product. (*Id*.).

88.     These and other design elements were misappropriated by Defendant Turn Medical through its founding members and ex-Arjo employees, including but limited to Defendants Eric Barta, Chris Niederkrom, Tara Psencik, and Kevin Wilson, and its continued poaching of current and former Arjo employees.

89.     Defendants are well aware of the highly confidential and trade secret nature of the Arjo product development plans and that ex-Arjo employees have access to proprietary diagrams, design documents, functional specifications, processes, and other restricted confidential information and trade secrets subject to a strict confidentiality agreement.

90.     Defendants Eric Barta, Chris Niederkrom, and Kevin Wilson were all integral to the development of KCI's Therapeutic Support Systems™ (TSS) products and services—all of which were purchased by and assigned to Arjo—and were intimately familiar with Arjo's confidential information and trade secrets including, but not limited to, proprietary diagrams, design documents, architecture diagrams, source code, functional specifications, and processes for the ROTOPRONE® bed and SKIN IQ®.  Former Arjo employees who have also joined Turn Medical were likewise integral to the development of Arjo's products and services and intimately familiar with and designers of Arjo's confidential information and trade secrets.

91.     On information and belief, Defendants have been operating in secret to hide their business from Arjo since 2018.  *See* https://www.startupssanantonio.com/turn-medical-automates-patient-prone-positioning-for-critical-care/ ("San Antonio-based Turn Medical, ***which had operated in a stealth mode until now***, will likely draw far more public attention as the company is launching its first commercial product.") (emphasis added).

92.     On information and belief, Ms. Psencik began working with Turn Medical while still employed at Arjo.

93.     Ms. Psencik holds herself out as "CEO and ***co-founder*** of Turn Medical." (*See* https://www.startupssanantonio.com/turn-medical-automates-patient-prone-positioning-for-critical-care/ (emphasis added)).   Turn Medical was founded in October of 2018.  (*Id*. ("Turn Medical's chief program officer Eric Barta, chief technology officer Kevin Wilson, and Chris Niederkrom, chief operations officer, worked together previously at Arjo [and] launched Turn Medical in October 2018.").   Ms. Psencik claims to have "worked at both companies and joined Turn Medical as its CEO in September 2020." (*Id*.).   Although Ms. Psencik appears to have waited exactly one year between leaving employment at Arjo (in August of 2019) and joining Turn Medical as CEO (in September 2020), on information and belief Ms. Psencik was already working with Turn Medical—the company she "co-founded."

94.     During her employment at Arjo, Ms. Psencik sent confidential, proprietary, and highly valuable Arjo information to her personal email address, including ROTOPRONE® customer lists, pricing, invoicing, and revenue information.   Customer pricing is treated as confidential and only made available to certain Arjo employees and customers/potential customers.   It is not distributed outside those groups and would give any competitor a competitive advantage.   On information and belief, Ms. Psencik has used and continues to use this confidential, proprietary, and valuable Arjo information at Turn Medical.

95.     Defendants Eric Barta and Chris Niederkrom were also responsible for the closing down of the research and development of the ROTOPRONE® improvement project, and for the storage and destruction of Arjo's confidential ROTOPRONE® improvement concept models.

96.     On information and belief, Defendants Eric Barta and Chris Niederkrom took the Project Revolve improved ROTOPRONE® concept model from the Arjo facility and used it to design their competing Pronova product.

97.     The Defendants' acquisition and disclosure of Arjo's confidential information and trade secrets are in violation of a number of agreements, including but not limited to the Separation Agreement and General Release Agreement that Mr. Barta signed on October 4, 2018; the Separation Agreement and General Release Agreement that Mr. Niederkrom signed on October 4, 2018; the At-Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017; and the Separation Agreement and General Release Agreement that Mr. Wilson signed on October 1, 2018.

98.     By acquiring and disclosing Arjo's confidential information and trade secrets without Arjo's consent or authorization, and in violation of their duty to maintain the secrecy of the same, Defendants Turn Medical, Eric Barta, Chris Niederkrom, Tara Psencik, and Kevin Wilson have misappropriated Arjo's confidential information and trade secrets.

99.     Defendants have and will continue to use Arjo's misappropriated confidential information and trade secrets, including without limitation, its vendor relationships and confidential and proprietary product designs and strategies, to divert business away from Arjo and otherwise unlawfully compete with Arjo and its ROTOPRONE® product.

100.    Arjo has suffered and will continue to suffer harm from misappropriation of its confidential information and trade secrets.  The amount of damage it will incur from this misappropriation is difficult to ascertain, and is likely to be irreparable.

## COUNT I – INFRINGEMENT OF THE '611 PATENT

101.    Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

102.    HTL is the assignee and owner of all right, title, and interest in and to the '611 Patent.  HTL has the exclusive right to make, use, sell, and offer to sell any product embodying the '611 Patent throughout the United States, and to import any product embodying the '611 Patent into the United States.

103.    The '611 patent is an invention of apparatus, systems, and methods to aid in the prevention of decubitus ulcer formation and/or promote the healing of such ulcer formation comprising a multi-layer cover sheet to aid in the removal of moisture, vapor, and heat adjacent and proximal the patient surface interface and in the environment surrounding the patient.

104.    Upon information and belief, Defendant Turn Medical has been and is now infringing at least claims 1, 13, 25, 33, 37, and 43 of the '611 patent in this State, in this District, and elsewhere in the United States, by, among other things, directly or through intermediaries, making, using, selling and/or offering for sale its Pronova product incorporating its InteliDerm surface.  Defendant Turn Medical is thus directly infringing, literally infringing, and/or infringing the '611 Patent under the doctrine of equivalents, and is liable for infringement of the '611 Patent pursuant to 35 U.S.C. § 271(a).

105.    Upon information and belief, Defendant Turn Medical will continue to directly infringe the '611 Patent unless enjoined.

106.    When placed into operation by Defendant Turn Medical or its users, its Pronova product incorporating its InteliDerm surface infringe claim 24 of the '611 Patent as they perform a method of removing moisture vapor from a person.  Such method comprises: providing a support

surface to support the person; and providing a cover sheet between the support surface and the person, wherein the cover sheet comprises: a vapor permeable material proximal to the person (the Patient Interface in the figure below); a spacer material (the Air Flow Spacer layer in the figure) between the vapor permeable material and the support surface (the Impermeable membrane and pressure redistribution surface below); and an air mover configured to pull air through the spacer material (the "InteliDerm Pumps" described in the Pronova O2 User Manual).



(https://turnmedical.com/inteliderm-powered-skin-protection/).

107. To the extent Defendant Turn Medical's Pronova product incorporating its InteliDerm surface, without more, do not directly infringe at claim 24 of the '611 Patent, Defendant Turn Medical contributes to infringement of the same under 35 U.S.C. § 271(c) inasmuch as its Pronova product incorporating its InteliDerm surface offered for sale and sold by Defendant Turn Medical is a component of a patented machine or an apparatus used in practicing a patented process, constituting a material part of the invention claimed in the '611 Patent, knowing the same to be especially made or especially adapted for use in infringement of the '611 Patent.

108.    Upon information and belief, Defendant Turn Medical will continue to contribute to infringement of the '611 Patent unless enjoined.

109.    Defendant Turn Medical actively encourage their customers to use its Pronova product incorporating its InteliDerm surface in an infringing manner.  Defendant Turn Medical actively induce its customers to infringe on the '611 Patent through instructions on its website and in the Pronova User Manual.  Defendant Turn Medical has encouraged this infringement with a specific intent to cause its customers to infringe.  Defendant Turn Medical's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b).

110.    Upon information and belief, Defendant Turn Medical will continue to induce infringement of the '611 Patent unless enjoined.

111.    Defendant Turn Medical's direct infringement, contributory infringement, and inducement of infringement of the '611 patent have irreparably harmed Plaintiffs.

112.    Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages adequate to compensate for the infringement.

113.    Defendant Turn Medical's infringement has been and is willful and, pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to treble damages.  Defendant Turn Medical's willful infringement is based at least on Defendant Turn Medical's knowledge of Plaintiffs, their products, patents, service offerings and service depots, clinical solutions, customers, sales, and pricing stemming from the fact that the entire Turn Medical leadership team—Eric Barta, Andrea Coxon, Arnie Garcia, Judy Long, Jeannette Losole, Chris Niederkrom, Tara Psencik, and Kevin Wilson— are former Arjo employees.  Defendant Turn Medical's conduct is egregious as it continues offering, selling, making, and using its Pronova product incorporating its InteliDerm surface despite knowledge of the infringement.  Defendant Turn Medical has either willfully and wantonly

27

infringed the '611 Patent or has recklessly avoided knowledge of its own infringement, even when faced with knowledge of Plaintiffs' products and patents.

114.    This case is "exceptional" within the meaning of 35 U.S.C. § 285, and Plaintiffs are entitled to an award of attorneys' fees.

## COUNT II – INFRINGEMENT OF THE '435 PATENT

115.    Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

116.    HTL is the assignee and owner of all right, title, and interest in and to the '435 Patent.  HTL has the exclusive right to make, use, sell, and offer to sell any product embodying the '435 Patent throughout the United States, and to import any product embodying the '435 Patent into the United States.

117.    The '435 patent is an invention of support surfaces for independent use and for use in association with beds and other support platforms, and more particularly but not by way of limitation to support surfaces that aid in the prevention, reduction, and/or treatment of decubitus ulcers and the transfer of moisture and/or heat from the body.

118.    Upon information and belief, Defendant Turn Medical has been and is now infringing at least claims 1, 2, and 3 of the '435 patent in this State, in this District, and elsewhere in the United States, by, among other things, directly or through intermediaries, making, using, selling and/or offering for sale its Pronova product incorporating its InteliDerm surface.  Defendant Turn Medical is thus directly infringing, literally infringing, and/or infringing the '435 Patent under the doctrine of equivalents, and is liable for infringement of the '435 Patent pursuant to 35 U.S.C. § 271(a).

119.    Upon information and belief, Defendant Turn Medical will continue to directly infringe the '435 Patent unless enjoined.

120.    When placed into operation by Defendant Turn Medical or its users, its Pronova product incorporating its InteliDerm surface infringe claim 1 of the '435 Patent as they perform a method for using a cover sheet.  Such method comprises: using a cover sheet (the InteliDerm surface) comprising an air mover (the "InteliDerm Pumps" described in the Pronova O2 User Manual), a first layer comprising a vapor permeable material; (the Patient Interface in the figure below); a second layer comprising a material oriented and configured to wick fluid toward a perimeter of the cover sheet and being less hydrophobic than the first layer (the Air Flow Spacer layer in the figure); and a third layer comprising a spacer material and being less hydrophobic than the first layer, wherein the second layer is between the first layer and the third layer, (the Impermeable membrane and pressure redistribution surface below); wherein the method comprises: creating air flow through the spacer material so moisture vapor passing through the first layer and into the second layer is distributed toward a perimeter of the cover sheet, wherein moisture vapor passing into the third layer is removed from the cover sheet by the air flow; and maintaining a relative humidity gradient between air adjacent a person disposed on the cover sheet and air pockets of the spacer material via the air flow.



Patient interface

Air flow spacer

Impermeable membrane and pressure redistribution surface

(https://turnmedical.com/inteliderm-powered-skin-protection/).

121.    To the extent Defendant Turn Medical's Pronova product incorporating its InteliDerm surface, without more, does not directly infringe at claim 1 of the '435 Patent, Defendant Turn Medical contributes to infringement of the same under 35 U.S.C. § 271(c) inasmuch as its Pronova product incorporating its InteliDerm surface offered for sale and sold by Defendant Turn Medical is a component of a patented machine or an apparatus used in practicing a patented process, constituting a material part of Plaintiffs' invention, knowing the same to be especially made or especially adapted for use in infringement of the '435 Patent.

122.    Upon information and belief, Defendant Turn Medical will continue to contribute to infringement of the '435 Patent unless enjoined.

123.    Defendant Turn Medical actively encourage their customers to use its Pronova product incorporating its InteliDerm surface in an infringing manner.  Defendant Turn Medical actively induce its customers to infringe on the '435 Patent through instructions on its website and in the Pronova User Manual.  Defendant Turn Medical has encouraged this infringement with a

specific intent to cause its customers to infringe.  Defendant Turn Medical's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b).

124.    Upon information and belief, Defendant Turn Medical will continue to induce infringement of the '435 Patent unless enjoined.

125.    Defendant Turn Medical's direct infringement, contributory infringement, and inducement of infringement of the '435 patent have irreparably harmed Plaintiffs.

126.    Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages adequate to compensate for the infringement.

127.    Defendant Turn Medical's infringement has been and is willful and, pursuant to 35 U.S.C. § 284, Plaintiffs are is entitled to treble damages.  Defendant Turn Medical's willful infringement is based at least on Defendant Turn Medical's knowledge of Plaintiffs, their products, and their patents stemming from the fact that the entire Turn Medical leadership team—Eric Barta, Andrea Coxon, Arnie Garcia, Judy Long, Jeannette Losole, Chris Niederkrom, Tara Psencik, and Kevin Wilson—are former Arjo employees.  Defendant Turn Medical's conduct is egregious as it continued offering, selling, making, and using its Pronova product incorporating its InteliDerm surface despite knowledge of the infringement.  Defendant Turn Medical has either willfully and wantonly infringed the '435 Patent or has recklessly avoided knowledge of its own infringement, even when faced with knowledge of Plaintiffs' products and patents.

128.    This case is "exceptional" within the meaning of 35 U.S.C. § 285, and Plaintiffs are entitled to an award of attorneys' fees.

## COUNT III – TEXAS UNIFORM TRADE SECRETS ACT

129.    Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

31

130.    While working for Arjo, Barta, Niederkrom, Psencik, and Wilson, among others, had full access to Arjo's proprietary trade secrets, including but not limited to Arjo's highly confidential and valuable list of unique user needs and new design elements from the Revolve and Tetris Projects.  Arjo's trade secrets are unique and not generally known to the public.  Arjo takes several steps to keep such trade secrets confidential.

131.    Arjo developed its trade secrets and confidential information at considerable expense, and such trade secrets and Confidential Information provide Arjo with a valuable advantage over Arjo's competitors.  Arjo's trade secrets also derive independent economic value from not being generally known and not being readily ascertainable to others who can obtain economic value from the information.

132.    Arjo's trade secrets and Confidential Information are protected by the Texas Uniform Trade Secrets Act, adopted by Texas and codified as Sec. 134A.001., et seq. of the Texas Civil Practice & Remedies Code.

133.    Defendants have repeatedly misappropriated, including through inevitable disclosure, Arjo's trade secrets in violation of the Texas Uniform Trade Secrets Act.  The misappropriation was willful and malicious, and intended to benefit Defendants to the detriment of Arjo.  Specifically, Defendants disclosed Arjo's trade secrets, without Arjo's express or implied consent, and at the time of disclosure they knew or had reason to know that the information was Arjo's confidential trade secrets and knew they had a duty to keep them secret because of the written agreements they signed and other circumstances during their employ with Arjo as described above.

134.    Further, by continually and repeatedly soliciting and hiring Arjo employees after departing Arjo, Defendants were and are able to willfully and maliciously gain detailed and

intimate knowledge of Arjo's Confidential Information and trade secrets through improper means. Defendants have and will inevitably use and rely on Arjo's trade secrets in furtherance of its products and services.

135.   Arjo has been damaged and will continue to suffer damages as the result of the Defendants' misappropriation and use of Arjo's trade secrets and Confidential Information, including but not limited to loss of customers, revenue, profits and additional expenses and for which there is no adequate remedy at law, as well as any unjust enrichment had by Defendants. Because Defendants' conduct was willful and malicious, Arjo is entitled to exemplary damages and attorney's fees under Tex. Civ. Prac. & Rem. Code §§ 134A.004(b), 134A.005(3).  Arjo is also entitled to injunctive relief under Tex. Civ. Prac. & Rem. Code § 134A.003, which will be requested by separate application.

## COUNT IV – DEFEND TRADE SECRETS ACT

136.   Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

137.   While working for Arjo, Barta, Niederkrom, Psencik, and Wilson, among others, had full access to Arjo's proprietary trade secrets including, but not limited to, Arjo's highly confidential and valuable list of unique user needs and new design elements from the Revolve and Tetris Projects. Arjo's trade secrets are unique and not generally known to the public.  Arjo takes several steps to keep such trade secrets confidential.

138.   Arjo developed its trade secrets and Confidential Information at considerable expense, and such trade secrets and Confidential Information provide Arjo with a valuable advantage over Arjo's competitors.

139.   Arjo's trade secrets and Confidential Information are protected by the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836 *et seq*.

140.   Defendants have repeatedly misappropriated, including through inevitable disclosure, Arjo's trade secrets in violation of the DTSA.  The misappropriation was willful and malicious, and intended to benefit Defendants to the detriment of Arjo.

141.   By continually and repeatedly hiring Arjo employees after departing Arjo, Defendant Turn Medical was and is able to gain detailed and intimate knowledge of Arjo's Confidential Information and trade secrets.  Defendants have and will inevitably use and rely on Arjo's trade secrets in furtherance of its products and services.

142.   Arjo has been damaged and will continue to suffer damages as the result of the Defendants' misappropriation and use of Arjo's trade secrets and Confidential Information, including but not limited to loss of customers, revenue, profits and additional expenses and for which there is no adequate remedy at law.

## COUNT V – BREACH CONTRACT AGAINST ERIC BARTA

143.   Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

144.   The Separation Agreement and General Release Agreement that Mr. Barta signed on October 4, 2018, constitutes a valid and binding contract between Arjo and Mr. Barta.

145.   Arjo has fully performed all of its material obligations under the Separation Agreement and General Release Agreement that Mr. Barta signed on October 4, 2018, including paying Mr. Barta $148,610.65 as consideration for, among other things, the general release and the other promises in the Separation Agreement, and all other conditions precedent have occurred or have been performed.

34

146.    Upon information and belief, Mr. Barta has and will continue to share Arjo's confidential information with Turn Medical in violation of ¶ 7 of the Separation Agreement and General Release Agreement that Mr. Barta signed on October 4, 2018.

147.    Defendants' breach has caused Arjo damages for which it now sues.  Additionally or in the alternative, Arjo has no adequate remedy at law and is suffering irreparable injury for Mr. Barta's breach of the Separation Agreement and General Release Agreement that Mr. Barta signed on October 4, 2018, and thus Arjo is entitled to an injunction compelling certain performance.

148.    In addition, Arjo is entitled to recover its attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001 et seq.  Defendants' conduct has required Plaintiffs to hire the undersigned attorneys to prosecute this suit.

## COUNT VI – BREACH CONTRACT AGAINST CHRIS NIEDERKROM

149.    Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

150.    The Separation Agreement and General Release Agreement that Mr. Niederkrom signed on October 4, 2018, constitutes a valid and binding contract between Arjo and Mr. Niederkrom.

151.    Arjo has fully performed all of its material obligations under the Separation Agreement and General Release Agreement that Mr. Niederkrom signed on October 4, 2018, including paying Mr. Niederkrom $175,958.16 as consideration for, among other things, the general release and the other promises in the Separation Agreement, and all other conditions precedent have occurred or have been performed.

152.     Upon information and belief, Mr. Niederkrom has and will continue to share Arjo's confidential information with Turn Medical in violation of ¶ 7 of the Separation Agreement and General Release Agreement that Mr. Niederkrom signed on October 4, 2018.

153.     Defendants' breach has caused Arjo damages for which it now sues.  Additionally or in the alternative, Arjo has no adequate remedy at law and is suffering irreparable injury for Mr. Niederkrom's breach of the Separation Agreement and General Release Agreement that Mr. Niederkrom signed on October 4, 2018.

154.     In addition, Arjo is entitled to recover its attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001 et seq.  Defendants' conduct has required Plaintiffs to hire the undersigned attorneys to prosecute this suit.

## COUNT VII – BREACH CONTRACT AGAINST TARA PSENCIK

155.     Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

156.     The At-Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017, constitutes a valid and binding contract between Arjo and Ms. Psencik.

157.     Arjo has fully performed all of its material obligations under the At-Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017.

158.     During her employment at Arjo, Ms. Psencik sent confidential, proprietary, and highly valuable Arjo information to her personal email address, including ROTOPRONE® customer lists, pricing, invoicing, and revenue information.  On information and belief, Ms.

Psencik has used and continues to use this confidential, proprietary, and valuable Arjo information with Turn Medical.

159. Upon information and belief, Ms. Psencik has and will continue to share Arjo's confidential information with Turn Medical in violation of ¶ 3 of the At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017.

160. Upon information and belief, Ms. Psencik violated the No Moonlighting provision of ¶ 2 of the At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017 beginning in or around October of 2018 by being a "co-founder" of Turn medical.

161. Upon information and belief, Ms. Psencik violated the No Solicitation of Customers provision of ¶ 4 of the At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017 beginning in or around October of 2018 by being a "co-founder" of Turn medical.

162. Upon information and belief, Ms. Psencik violated the No Solicitation of Employees provision of ¶ 5 of the At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017 beginning in or around October of 2018 by being a "co-founder" of Turn medical.

163. Arjo has no adequate remedy at law and is suffering irreparable injury for Ms. Psencik's breach of the At Will Employment, Confidential Information, Non-Solicitation, and Invention Assignment Agreement that Ms. Psencik signed on July 14, 2017.

## COUNT VIII – BREACH CONTRACT AGAINST KEVIN WILSON

164.    Plaintiffs re-allege the foregoing allegations contained in the previous paragraphs as if fully set forth and restated herein.

165.    The Separation Agreement and General Release Agreement that Mr. Wilson signed on October 1, 2018, constitutes a valid and binding contract between Arjo and Mr. Wilson, and all other conditions precedent have occurred or have been performed.

166.    Arjo has fully performed all of its material obligations under the Separation Agreement and General Release Agreement that Mr. Wilson signed on October 1, 2018, including paying Mr. Wilson $ 77,231.70 as consideration for, among other things, the general release and the other promises in the Separation Agreement.

167.    Upon information and belief, Mr. Wilson has and will continue to share Arjo's confidential information with Turn Medical in violation of ¶ 7 of the Separation Agreement and General Release Agreement that Mr. Wilson signed on October 1, 2018.

168.    Defendants' breach has caused Arjo damages for which it now sues.  Additionally or in the alternative, Arjo has no adequate remedy at law and is suffering irreparable injury for Mr. Wilson's breach of the Separation Agreement and General Release Agreement that Mr. Wilson signed on October 1, 2018.

169.    In addition, Arjo is entitled to recover its attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001 et seq.  Defendants' conduct has required Plaintiffs to hire the undersigned attorneys to prosecute this suit.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Judgment in Plaintiffs' favor and:

A.      Enter judgment that Defendants infringe the Patents-In-Suit;

B.      Enter judgment that Defendants are jointly and severally liable for infringement of the Patents-in-Suit;

C.      Preliminarily and permanently enjoin Defendants their officers, agents, representatives, employees, and those persons acting in concert or participation with them:

   a.   from using now and in the future any and all of Arjo's Confidential Information or proprietary information taken from Arjo, including but not limited to documents and information relating to Arjo's list of unique user needs new and innovative design elements to improve the ROTOPRONE® bed; ROTOPRONE® customer lists, pricing, invoicing, and revenue information; and documents and information relating to Arjo's SKIN IQ® Microclimate Manager;

   b.   to return any Arjo Confidential Information to Arjo immediately;

   c.   immediately refrain from all unauthorized use and/or misappropriation of any and all copyright, trade secret, and other proprietary rights belonging to Arjo now and in the future;

D.      Order Defendants to pay actual and consequential damages that Plaintiffs have suffered as a result of Defendants' wrongful actions;

E.      Enter judgment that Defendants have willfully infringed the Patents-In-Suit and increase the damages award to Plaintiffs up to three times the amount assessed, pursuant to 35 U.S.C. § 284;

F.      Order Defendants to disgorge all profits attributable to Defendants' wrongful actions;

G.      Grant Plaintiffs exemplary damages as provided for by federal and state statutes;

H.      Grant Plaintiffs attorneys' fees and costs as provided for by federal and state statutes;

I.      Grant further equitable relief in order to enjoin the harm caused by Defendants;

J.      Grant Plaintiffs prejudgment and post-judgment interest;

K.      Find that this an exceptional case and award Plaintiffs reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285 and other applicable statutes; and

L.      Grant such other and further relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated: November 23, 2021.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By:      */s/ Caroline Newman Small*
Caroline Newman Small
State Bar No. 24056037
E-mail: *csmall@dslawpc.com*
719 S. Flores Street
San Antonio, Texas 78204
Tel:  (210) 853-5882
Fax:  (210) 200-8395

**ICE MILLER LLC**

Tom Rammer
(*pro hac vice forthcoming*)
Illinois Bar No. 6297479
E-mail: *Tom.Rammer@icemiller.com*
Alice Kelly
Illinois Bar No. 6281897
E-mail: *Alice.Kelly@icemiller.com*
(*pro hac vice forthcoming*)
200 W. Madison Street, Suite 3500
Chicago, Illinois 60606
Tel: (312) 726-5167

***Counsel for Plaintiffs***